1

2

3

4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7    HASSAN LEE BRATCHER,                    Case No.  23-cv-05566-PCP

8                           Plaintiff,

**ORDER DENYING PETITION FOR**
9            v.                             **WRIT HABEAS CORPUS**

10    GISELLE MATTESON, et al.,

11                          Defendants.

12          Petitioner Hassan Bratcher petitions for a writ of habeas corpus challenging the validity of

13    his state criminal conviction. The Court ordered a response to the petition. Dkt. No. 6. Respondent

14    filed an answer and a memorandum of points and authorities in support thereof. Dkt. No. 12.

15    Bratcher filed a traverse. Dkt. No. 22. The Court then ordered and received supplemental briefing

16    from respondent on an expanded claim presented in Bratcher's traverse. Dkt. Nos. 23, 24. The

17    Court has carefully considered the arguments in the parties' briefing. For the reasons set forth

18    below, the petition is denied and a certificate of appealability will issue as to only one issue.

19                                    **BACKGROUND**

20          Bratcher was tried twice for kidnapping and rape. His conviction at the first trial was

21    reversed on appeal because the trial court judge had erroneously expelled a juror who had caused a

22    "deadlock[ ] on both counts … for over two days." *People v. Bratcher*, 2019 WL 2500366, at *2

23    (Cal. Ct. App. June 17, 2019). After his second trial in 2019, Bratcher was convicted on both

24    counts and sentenced to 25 years to life in prison. Dkt. No. 13-2, at 80.

25          Bratcher's habeas claims hinge on the omission of a cautionary jury instruction at his

26    second trial. That instruction requires the jury to "consider with caution any statement made by the

27    defendant tending to show his guilt unless the statement was written or otherwise recorded."

28    CALCRIM No. 358. At trial, the jury instruction would have applied to testimony about

United States District Court
Northern District of California

Bratcher's alleged statements from four witnesses: Jane Doe, the victim in the case, and M. Doe, B. Doe, and Whitney Doe, all of whom were propensity witnesses testifying about Bratcher's uncharged past sexual offenses. Dkt. No. 13-12, at 35–37. On appeal, the California Court of Appeal found that the jury instruction's omission violated state law as to each witness's testimony, but nonetheless upheld Bratcher's conviction after finding that the error was harmless. Dkt. No. 13-12, at 38–46. The California Supreme Court denied Bratcher's petition for review. Dkt. No. 13-17.

## I.    Statement of the Facts[1]

The California Court of Appeal summarized the facts as presented at trial as follows:

### A.    The Underlying Crimes

> Jane Doe was a 33-year-old woman between seven and eight months pregnant, who had significant intellectual and learning disabilities. On March 5, 2017, she left a transitional housing shelter in Oakland where she lived to take a transit bus to Love Temple Missionary Baptist Church located on 85th Avenue and Birch Street in Oakland. The church has a parking lot located in the rear. Jane Doe is a member of the church who attended sporadically, but was known by a male deacon and a female member.

> At 8:25 a.m. that day, Jane Doe exited the bus and walked across 85th Avenue. Because she was pregnant, she was feeling tired and her feet were swollen. As she was walking down the sidewalk on 85th Avenue near the church, defendant drove up in a white van with tinted windows. Through an open window, defendant said to Jane Doe, "'You know me.'" Jane Doe had never seen him before, and feeling "[k]ind of scared," she responded, "'I don't know you.'" Because Jane Doe was "so tired," she asked defendant for a ride to the church. After defendant agreed to give her a ride, she got into the van, sitting in the right front passenger seat, and defendant gave her a ride to the church.

---

[1] The Court has independently reviewed the record as required by AEDPA. *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017). Based on the Court's independent review, the Court can reasonably conclude that the state court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness unless otherwise indicated in this order. *Taylor v. Maddox*, 366 F.3d 992, 999–1000 (9th Cir. 2004), *overruled on other grounds by Murray v. Schriro*, 745 F.3d 984, 999–1000 (9th Cir. 2014).

United States District Court
Northern District of California

Defendant parked in the church's empty parking lot near the back door of the church. He did not threaten Jane Doe. After being informed by a church member that a vehicle was parked "up to" the back door, a church deacon opened the door, approached the van, and spoke with defendant through his open driver's side window, asking him what he was "doing there at that time in the morning." In response, defendant asked the deacon, "'Is this a church?,'" after which he added, "'I'm sitting here chilling.'" Defendant appeared to be under the influence and had "a lot of white powder around his beard." The deacon told defendant he could not "'sit here and chill.'" The passenger's seat, according to the deacon, was reclined, and the passenger "waved" but did not speak. Following his encounter with defendant, the deacon walked back into the church to his desk to finish "doing his business."

Defendant drove to the side of the church and parked his van. He started throwing money on the passenger seat where Jane Doe was sitting. Jane Doe was "mad" and told defendant she was not a "hoe" (sic) at which point, he took his money back, stating, "'I know what pregnant pussy taste like [sic]'" or "'I know something about pregnant pussy.'" She attempted to exit the passenger's side of the van, but defendant locked the door. Jane Doe testified that defendant was clapping his hands. She asked defendant if she was a "hostage." He said, "'Yes.'" She felt "afraid."

Defendant drove away from the side of the church to a "dead-end by the old man's house." He subsequently pulled his vehicle into the driveway of a house located at the end of a dead-end street at the corner of 105th Avenue and Breed Avenue, and parked up against the garage door. Jane Doe did not want to go to this house. While situated in the van in the driveway, defendant removed Jane Doe's clothing and wearing just a T-shirt, he inserted his penis inside her vagina. Jane Doe felt mad and sad. She was afraid, but claimed she could not attempt to escape because she could not "walk that fast."

Defendant eventually stopped having sex with Jane Doe, and pulled out of the driveway, driving to a different location in front of a home, which was near Beverly Avenue and Broadmoor Boulevard in the City of San Leandro. Jane Doe identified a photo of this location because she recognized the trees and houses. She did not want to go there. When they arrived at this location, Jane Doe was not wearing the clothing defendant previously removed. They had "sex again" in the van. Defendant put lotion on his penis and, without using a condom used his penis to penetrate her vagina. She told defendant "no" about three times. At some point, while at this location, Jane Doe asked defendant four times to take her to the church. He replied, "'No.'"

Thereafter, Jane Doe told defendant she needed to use the bathroom,

3

and he drove her to another location which "had stairs." Jane Doe did not know she was going there, had never been there before, and did not want to go there. After defendant parked the van, defendant "had to come help [Jane Doe] out of the car." He held her shoulder with one hand to prevent her from going anywhere. She felt "Afraid." When Jane Doe got out of the van, she did not have her shoes, socks, pants or underpants on, but she was wearing a long dress. Jane Doe used the bathroom near the stairs to urinate. While she was urinating, Jane Doe heard somebody come down the stairway. Defendant told her to "'Get back in the van,'" and she complied.

At one point, while driving around in the van, defendant parked in front of an orange house. Not only had Jane Doe never been there, but she did not want to go there. Because she was "very scared," she cried, but nothing else happened at the orange house.

Ultimately, defendant stopped at a park next to Webster Academy in Oakland and told Jane Doe to, "get out, bitch." Jane Doe walked to a Walgreens on International Boulevard. There, she used her cellphone to call her sister, T.M., twice. During the first call, Jane Doe, who was crying, told her sister something had happened to her, causing her to miss church. And during the second call, Jane Doe stated a man had forced her into a vehicle and raped her.

Following the second phone call, T.M. called the police, and in the meantime, Jane Doe called her brother to come and pick her up. Jane Doe's brother picked her up and drove her to the transitional shelter where she had been living. When she arrived at the shelter, her mother, sister, and stepfather were there. In response to her sister's phone call, both the police and an ambulance arrived at the shelter.

Jane Doe was transported by ambulance to Highland Hospital where she received a sexual assault examination performed by a physician's assistant. Testifying as a sexual examination expert, the physician's assistant indicated that during the examination, he observed redness, swelling, and tenderness on Jane Doe's labia and in the "structures at the base, opening of the vagina," and "a 2 millimeter linear tear with small red blood at the base of the linear abrasion." These injuries, according to the physician's assistant, were significant and "[m]ore often than not, [he does] not see injuries this severe in sexual assault cases." The sexual assault examination also included the swabbing of Jane Doe's anus and vagina for DNA samples. Defendant's DNA was later found on the anal swab; however, the DNA was not from sperm, but it could have been from skin or saliva.

That evening at 9:30 p.m., Jane Doe called A.M., an independent contractor who worked with Jane Doe through the Regional Center of the East Bay. Jane Doe told A.M. that she had been raped and had gone to the doctor.

**B.     Uncharged Sex Crimes**

Pursuant to Evidence Code section 1108, the trial court allowed evidence of three uncharged sex offenses to demonstrate defendant had a propensity to commit sexual offenses against women.

**1.     Whitney Doe**

Whitney Doe testified that around noon on March 19, 2017, she took her dogs to a dog park, located near her residence in Oakland. She was alone and did not have her cell phone. As Whitney walked through the pedestrian gate of her complex to the dog park, she observed a white "socker mom van [*sic*] with little stick people, family sticker on the back" parked up against another gate, the "drive through gate." This vehicle had tinted back windows and was "unusual for [the] area" because there were a few families living in the building, but they did not drive "cars like that." The van was also blocking other vehicles from entering or exiting. When Whitney walked by the passenger's side of the vehicle, she saw an unfamiliar man, defendant, in the driver's seat staring at her "super hard." She felt "[e]xtremely uncomfortable" but continued on to the park.

Once Whitney entered the dog park, she let her dog off its leash and turned back around so she did not have her back to the vehicle. As Whitney's friend, Sarah, came through the pedestrian gate to walk her dog, defendant began staring at her. When Sarah indicated she did not know defendant, Whitney asked her to take a cell phone picture of the van. After Sarah took a picture, defendant made a U-turn and parked "nose to nose with a parked car," blocking Sarah outside the dog park. Whitney pulled Sarah inside the dog park, took ahold of her pit-mix dog, shut the park's gate, and told defendant he needed to "back up and back off of [them]." In response, defendant started saying "really uncomfortable disgusting terrible things." Whitney asked defendant to leave at least three times and, walking closer to the car, took photographs with her friend's phone. While she was taking pictures, defendant made lewd comments and faces. He rolled down the driver's side window at which point, Whitney saw defendant's penis, drugs, empty bottles, and "a passed out mostly naked female" in the passenger seat. Defendant told Whitney he wanted to "fuck [her]" and "fuck whitey." He continuously pulled on his penis while Whitney was taking pictures. As Whitney stepped back from the van, the driver's side sliding door opened, and defendant asked her to get in the vehicle. She refused and called the police. At no time did defendant cover his genitals or turn his body away from Whitney. She felt afraid for herself and the woman inside the van.

The parties stipulated that defendant was acquitted of a violation of Penal Code section 314, indecent exposure, in connection with this incident.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## 2.    M. Doe

M. Doe, who was in custody for an unresolved misdemeanor theft case, testified she first met defendant, a good friend, eight years earlier in east Oakland. She saw him once or twice a month. They drank, smoked weed, did cocaine, and partied together.

In December 2014, while M. was walking on International Boulevard, defendant pulled up in a Mercedes, stopping to talk with her. After asking defendant if he could get her cocaine, M. climbed into his car. Defendant bought some cocaine, and they went to his house. At defendant's residence, defendant and M. drank vodka, smoked and snorted cocaine, watched porn, and had oral and vaginal sex. Defendant had not ejaculated, and when M. was getting ready to leave at 4:00 a.m., "things turned south."

Defendant indicated he could find some more cocaine since he had run out. He tried calling a friend who did not answer the phone. When M. stated once more that she was leaving, defendant snatched the wig off her head, and said, "'Bitch, you're not going nowhere. Get back in the room.'" Defendant then grabbed M. and threw her back into his bedroom. She was shocked and surprised. Then he made her take off her clothes, stating in a "forceful tone," "'Take that shit back off.'" Defendant threatened to punch M. in the face, while putting his right fist in the palm of his left hand. She was scared and did not believe defendant was joking. Defendant "pushed" M. onto the bed and continued to try to have sex with her. While M. was lying on her stomach, he folded his arms around her neck and bit her back, preventing her from extricating herself. He inserted his penis inside her vagina for a long time without her consent as he watched "porn," drank alcohol, and smoked weed. Defendant also grabbed M.'s head, forcing her to give him oral sex.

Eventually, defendant ceased assaulting M. As defendant was walking around the room on his cell phone, M. ran through the kitchen to the back door but was prevented from getting outside by the top lock of the screen door. Defendant "socked" M., causing her to pass out. He then grabbed M.'s leg, dragged her away from the screen door, and bit her leg.

While M. was in defendant's residence, she yelled for help, and at some point, the police arrived, announced their presence, and defendant allowed M. to leave through the back door.

Subsequently, during the trial in the present matter, as M. was being transported back to the jail, she saw defendant in an elevator. While she was standing at the door of the elevator, M. said to defendant, "Oh my god. What happened, Hassan? You did it again?" And defendant replied in "so many words," "'Yeah.'" After M. told defendant she

was "'supposed to go [to] court next week,'" defendant stated, "he knows," and told M. "to come here and say I don't remember anything. And he'll pay me to say that." M. did not agree.

### 3.     B. Doe

B. Doe, who was 66 years old at the time of trial, testified about an incident that occurred on December 27, 2014. At that time, B. was a prostitute. She smoked crack and drank alcohol. That day, in the early morning, while walking to a store on or near San Pablo Avenue, B. saw defendant in a car. She entered defendant's car with the purpose of just sitting, drinking, and talking for "a minute or so." B. knew defendant through "other ladies. But that was it." They drove to defendant's apartment.

While driving to the apartment, defendant tried to solicit B. for prostitution but "it didn't happen" because defendant did not "bother [her] in that way." Upon arriving at defendant's apartment, they sat down and talked, and B. drank wine from a bottle she brought with her. She used her phone to ask a friend to pick her up. As she was getting ready to leave, defendant grabbed her phone, talked to her friend, called her a "'Bitch,'" and told her not to call back. After B.'s friend called back, defendant took the battery out of the phone and threw the battery and the cell phone. B. was "scared to death." When B. told defendant she was going to leave, he responded she was not going anywhere, and hit her in the mouth, causing her lip to bleed. Defendant gave her paper towels to stop the bleeding. When defendant turned his back, she ran out of a sliding glass door to the balcony, with the thought of jumping off the balcony, but defendant pulled her back inside. She screamed "to the top of [her] lungs" for help and unsuccessfully tried to escape. B. tripped on the floor and landed "flat on the floor, on [her] back." Defendant got on top of her and put his thumbs on each side of her neck, applied pressure, and stated, "'I told you to be quiet. Don't make no noise.'" B. could not breathe. Defendant told her to take her pants off and she complied because she was scared and wanted to "get out of there." During the assault, B. saw defendant's penis, but it was not erect and he did not touch her sexually. She did not want to see it.

When Oakland police officers eventually arrived and knocked on defendant's door, defendant told B. to "'Be quiet.'" They knocked again, "maybe three times before [defendant] said, 'Just a minute.'" After the police stated, "'Open the door,'" B. crawled on the floor from the living room to the door, but defendant put a bar chair against the door. B. warned the police that defendant had put a barstool under the doorknob. The door was finally opened, and she told the police what happened. Officer Kathryn Reymundo observed that B.'s lip was swollen, she was bleeding from her mouth, and there was fresh blood on the floor. The officer noted defendant was completely nude

and did not have any injuries.

The parties stipulated defendant was acquitted of a violation of Penal Code section 220, subdivision (a)(1), assault with intent to commit rape, in connection with this incident.

## C.     Defendant's Testimony

### 1.     Jane Doe Incident

Defendant testified that on the morning of March 5, 2017, while he was in his white van, he observed Jane Doe on 85th Avenue and Birch Street near the church parking lot. He was wearing an ankle monitor. Defendant thought he may have seen Jane Doe before but had never spoken to her. Defendant "dipped" next to Jane Doe, and they both said, "'What's up.'" She asked to get into his van. Defendant did not threaten or try to intimidate her into entering the van. Because defendant believed there were "a lot of prostitutes and drugs and everything" in that neighborhood and thought Jane Doe might be a prostitute, he allowed her to climb into the van to "have sex." At first, defendant did not notice she was pregnant as she had a big jacket on and was "covering with her purse." After Jane Doe gestured toward the church parking lot, defendant drove there. He thought she was directing him to a "spot [where] we could do it at."

Before encountering Jane Doe, defendant had recently purchased cocaine and began breaking it down in the parking lot. He then "jumped out real quick," retrieved a bottle of alcohol from the vehicle's trunk, put alcohol inside a water bottle, wrapped the bottle in a jacket, and put the alcohol back in the trunk.

As defendant was "sniffing powder," the church deacon came outside, approached the driver's side of the vehicle. The driver's side window was open. The deacon wanted to know what defendant was doing, told him he could not "'be right here,'" and could not come into the church yet, because regular church services did not start until 11:00 or 11:30. According to defendant, the deacon could tell he had cocaine on his beard. In the meantime, Jane Doe put her seat back, slouched down, and when the deacon looked in her direction, she raised her hand to her face turning to the right, as if she was trying to hide from him.

Defendant put his seat belt on because he was under the influence, drinking, and already on parole. He then drove to the side of the church on Birch Street and parked. There, he sniffed cocaine, drank, and listened to music. At this point, according to defendant, Jane Doe stated, "'How much you got?'" Defendant replied he had about $30 for her, to which she responded, "'I ain't no cheap hoe [*sic*].'" He then handed Jane Doe $50, which she accepted.

United States District Court
Northern District of California

Defendant claimed he drove, at Jane Doe's direction, to Olive Street near 96th or 95th Avenue. She hopped out of defendant's vehicle and went to an apartment complex and obtained some powder that made her hallucinate. Following their stop at Olive Street, they drove to 100th Avenue and Birch Street where defendant sniffed powder and Jane Doe was "doing her thing."

Next, they traveled to a dead-end street at 105th Avenue, where defendant parked at a garage. He jumped out of the car "to use the bathroom." Jane Doe also got out of the car on the passenger's side because she thought defendant was going to take her into one of the houses. Defendant urinated, got back in the van, at which point, an elderly man came out of his house, and said they better leave or he would call the police. They were both still dressed.

From there, defendant drove Jane Doe to a driveway on 108th Avenue, where they had sex while standing outside the van. This was the first time defendant realized she was pregnant. Defendant used a condom and lotion. According to defendant, he only had sex with Jane Doe once, presumably at 108th Avenue. Because a car drove by and somebody was walking by, defendant stopped and got into the front seat of the van and drove away.

Defendant thought Jane Doe wanted "to go pee" because "the lotion was burning her vagina." They went to some "apartment complexes" where she urinated by the stairs. As Jane Doe was wiping herself with some paper towels given to her by defendant, some people came down the stairs.

Defendant and Jane Doe left and drove about two blocks away to Beverly Street. Once they reached this location, defendant testified he was "fishing up the last of the cocaine [he] had," and Jane Doe "was doing her thing with her drugs." Then "she started tripping" and believed his phone was turning red. Jane Doe stated defendant needed to take her back to the church, but defendant was feeling a little sick and asked her to "'[h]old on for a minute.'" She "kept nagging" him to take her back, and ultimately he dropped her off near the church. Defendant denied forcing Jane Doe to go anywhere she did not want to go, or forcing her to do anything sexual, or threatening or hitting her. "Everything was consensual."

Defendant acknowledged Jane Doe had a speech impediment when she testified, making it difficult to understand her; however, he claimed she spoke more clearly when he met her, although she may have occasionally stuttered.

### 2.    Other Offenses

#### i.    Whitney Doe

As to Whitney Doe, defendant testified he was in his van with a woman who was giving him oral sex when Whitney approached the vehicle, became "nosy," and looked inside. Defendant moved the van. He insisted he did not try to get Whitney's attention, flag her down, call her over to the van, or attempt to show her his "private parts." Rather, he claimed Whitney approached his vehicle with a pit bull and told him, "'Get the fuck out of here.'" While she was there, he was not masturbating, nor was his penis erect, but he had cocaine in his hands. The woman in the van said to Whitney, "'You act like you want to get in or something.'" Defendant denied saying he wanted to "fuck whitey." Instead, he stated, "'She want to hit the white girl,'" referring to the cocaine. He did not know Whitney was taking pictures until the "last few." When the police arrived, defendant admitted he did not obey their commands and tried to "get around them" because he was in possession of cocaine.

#### ii.    M. Doe

Defendant testified about his contact with M. Doe. He had known her for about a year prior to the incident, and they had been to each other's residence on several occasions. Defendant met M. on the "track on International" and had a paid sexual relationship with her. Usually, they got high, drank, and had sex.

Defendant testified that on December 13, 2014, he met M. on 62nd Avenue and International Boulevard. He told her he wanted to reach an understanding before paying her with his money and drugs. She instructed him to obtain drugs for her so she could experience a high first. In exchange for money and drugs, she would "'do how we usually do.'" Prior to going to defendant's residence, defendant gave M. $50 for her to purchase $30 of crack with the understanding that she would keep the $20 balance.

Once they arrived at his residence, they drank vodka, M. got undressed, and smoked crack in the bathroom. They both used powder cocaine. However, defendant became involved in an altercation with M. in his bedroom because he paid her to have sex, but she "kept stalling," eventually informing him, "'I ain't giving you shit. I ain't giving you nothing.'" When M. refused to give the money back to defendant, they argued. After defendant went to the bathroom, M. tried to run out the back door and started screaming and yelling when she was unable to open the gate. Reacting to her screaming, defendant said, "'Bitch, what are you doing?'" They got into a "tussle, scuffle," pushing each other, and ended up on the ground wrestling. Defendant "probably" choked, bear hugged, and bit M. When the police arrived,

he thought he "probably let her out" through the back door. Defendant could not remember whether he had sex with M., but did not think so. He maintained he never forced or threatened M. to have sex with him.

While defendant acknowledged speaking briefly with M. when he was inside the elevator and she was outside, he denied offering her money to testify she had forgotten about what happened between them. M. just inquired, "'What happened?'" and he told her this was the same case as the last trial which had been reversed.

### iii.    B. Doe

With respect to B. Doe, defendant testified he did not know her prior to the incident on December 27, 2014; however, he claimed she knew about him from "[her] girlfriends." On that day, defendant saw B. on San Pablo Avenue, one of the prostitution "tracks." As he was driving his BMW, B. flagged him down, which defendant interpreted to mean she wanted to have a sexual "date." B. entered his vehicle and agreed "she would like to date." When she asked him for alcohol, defendant replied he had alcohol at his house. He drove B. to his second residence on 14th Street, where defendant drank alcohol and they both used cocaine. They also talked "about a lot of stuff."

Defendant went into the bathroom, and when he came out, B., who was supposed to be ready for sex, was standing next to his jacket which was hanging on the barstool. She looked "stunned," as if he had "caught her in the act." Because defendant could tell his jacket had been moved, he checked the jacket pocket which contained his watch and a "Jesus peace chain." Although his chain was still in the pocket, the watch was not. As B. moved swiftly to leave, defendant told her to "'Hold on'" so he could check her purse for his watch. B. refused to let him look in her purse, stating, "'I ain't got nothing.'" Though they did not engage in sex, at this point, defendant was naked. They started arguing about defendant's demand to look into her purse, and B. ran to the back balcony and screamed. Defendant told her to "'Get in here,'" grabbed her, and pulled her back into the apartment. A tussle ensued as defendant attempted to open B.'s purse to retrieve his watch. During the tussle, B. bit defendant's hand, and he responded by hitting her in the mouth and "probably" choking her. Defendant found his watch in her purse and put it back in his jacket pocket.

Soon thereafter, the police arrived and started banging on the door. Defendant was in a "frenzy" because there was cocaine and blood "everywhere," and he was naked. He gave B. a paper towel to cover her mouth and rinsed his bleeding hand. Naked, defendant opened the door. The officers arrested him. [Defendant called as witnesses a paramedic and two Oakland police officers who testified about Jane Doe's prior inconsistent statements.]

11

1  *People v. Bratcher*, No. A159493, 2022 WL 2128061, at *1–8 n.5 (Cal. Ct. App. June 14, 2022)

2  (footnotes otherwise omitted).

3  **II.     Failure to give cautionary instruction.**

4       The same defense counsel represented Bratcher at his first and second trial. CALCRIM

5  No. 358 and its cautionary instruction were given at Bratcher's previous trial as to all four

6  witnesses. Dkt. No. 22-1, at 7.

7       At Bratcher's second trial, defense counsel requested that CALCRIM No. 358 and its

8  cautionary instruction be given again. Dkt. No. 13-8, at 248. The prosecutor requested that the

9  cautionary instruction not be given, arguing that it generally applied only to a defendant's

10  statements to law enforcement and not to out-of-court statements to alleged victims. *Id.* at 248–49.

11  Defense counsel seemingly conceded on those grounds that the cautionary instruction did not

12  apply to Jane Doe's and B. Doe's statements; however, he argued it did apply to M. Doe's

13  statements and did not withdraw his request for the cautionary instruction. *Id.* at 249–50.

14  Ultimately, the trial court refused to give the cautionary instruction but held that defense counsel

15  would be allowed to argue to the jury that it "should consider with caution any statement that

16  [Bratcher] made to [M. Doe]." *Id.* at 250.[2] The jury found Bratcher guilty of both counts after

17  about five hours of deliberation.

18  **III.    The California Court of Appeal affirms Bratcher's conviction.**

19       On appeal, Bratcher argued, *inter alia*, that the trial court's failure to give the cautionary

20  instruction violated the state and federal constitutions and required reversal because "the only

21  evidence indicating that the events with Jane were not consensual were essentially the allegations

22  of Jane that appellant achieved the kidnapping and rape with verbal statements indicating

23  deception and intimidation [because the fact that the car ride and intercourse occurred were

24  undisputed]. … [Further,] the prejudice caused by the missing cautionary instruction was

25  increased because the jury was instructed that [Bratcher's] convictions could be based on Jane's

26  testimony alone. … This was particularly important because Jane's testimony on appellant's

27

28  _____

[2] Bratcher's counsel did not ultimately argue the instruction in his closing argument.

1  statements struck at the primary issue in the case—consent." Dkt. No. 13-11, at 58, 63. Bratcher
2  presented similar arguments against the failure to provide the cautionary instruction with respect
3  to Whitney, B., and M. Doe's testimony about the uncharged crimes. Bratcher also argued that, if
4  his objection to the failure to give the instruction was forfeited or the error was invited, he had
5  received ineffective assistance of counsel.

6      The California Court of Appeal affirmed Bratcher's conviction, holding that the trial
7  court's failure to give the cautionary instruct was not a federal constitutional error. The Court of
8  Appeal did not address Bratcher's ineffective assistance of counsel claim because the "Attorney
9  General concede[d] this issue [was] not forfeited" and the Court of Appeal had addressed the
10  instructional error on the merits. The Court of Appeal focused the bulk of its analysis on
11  describing why the trial court's failure to give the cautionary instruction, although an error under
12  state law, was not prejudicial. The California Supreme Court denied Bratcher's petition for review.

13                                    **LEGAL STANDARD**

14      Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a
15  federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in
16  custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C.
17  § 2254(a). The petition may not be granted with respect to any claim adjudicated on the merits in
18  state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was
19  contrary to, or involved an unreasonable application of, clearly established Federal law, as
20  determined by the Supreme Court of the United States; or (2) resulted in a decision that was based
21  on an unreasonable determination of the facts in light of the evidence presented in the State court
22  proceeding." 28 U.S.C. § 2254(d).

23      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court
24  arrives at a conclusion opposite to that reached by [the United States Supreme] Court on a
25  question of law or if the state court decides a case differently than [the] Court has on a set of
26  materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).
27  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state
28  court identifies the correct governing legal principle from [the] Court's decisions but unreasonably

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409. This is a highly deferential standard for evaluating state court rulings: "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

## ANALYSIS

### I. The omission of the cautionary jury instruction did not so infect the entire trial with unfairness as to violate Bratcher's Fourteenth Amendment right to due process.

Bratcher contends that the omission of the instruction that the jury must consider his out-of-court statements with caution violated his federal right to due process.

A challenge to a jury instruction that asserts solely an error under state law does not state a claim cognizable in federal habeas. *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991). To obtain federal collateral relief for instructional error, the petitioner must instead show that the error "so infected the entire trial that the resulting conviction violates due process." *Id.* at 72. "[T]he instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.* "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional right]." *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Where the alleged error involves the failure to give an instruction, the burden on the petitioner is "especially heavy." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). And even if a constitutional error occurred, federal habeas relief remains unwarranted unless the error caused prejudice, *i.e.*, unless it had a substantial and injurious effect or influence in determining the jury's verdict. *See Hedgpeth v. Pulido*, 555 U.S. 57, 61–62 (2008) (per curiam); *see also Brecht v.*

14

1    *Abrahamson*, 507 U.S. 619, 623 (1993).

2        **A.**    **The state court's reasoning.**

3        The California Court of Appeal rejected Bratcher's argument that his federal right to due

4    process was violated by the omission of the cautionary instruction, concluding that "[m]ere

5    instructional error under state law regarding how the jury should consider evidence does not

6    violate the United States Constitution." *Bratcher*, 2022 WL 2128061, at *10 n.8 (quoting *Estelle*,

7    502 U.S. at 71–75) (other citations omitted). Accordingly, the court "reject[ed] defendant's

8    argument that [it] should evaluate prejudice under the beyond a reasonable doubt standard

9    [required for federal constitutional violations,] *Chapman v. California*, [ ] 386 U.S. 18, 24

10    [(1967)]." *Id.*

11        **B.**    **The state court's decision was not contrary to, or an unreasonable application of, clearly established federal law, nor based on an unreasonable**
12                      **determination of the facts in light of the evidence.**

13        It was reasonable—not contrary to, or an unreasonable application of, clearly established

14    federal law nor an unreasonable determination of the facts in light of the evidence—for the state

15    court to conclude that the trial court's failure to instruct with the CALCRIM No. 358 cautionary

16    instruction did not deprive petitioner of due process of law when the trial court extensively

17    instructed the jury on how to assess witness credibility. *See Green v. Sherman*, No. 5:17-CV-

18    01048-SVW-JC, 2020 WL 8991750, at *13 (C.D. Cal. Sept. 7, 2020), *report and recommendation*

19    *approved*, No. 5:17-CV-01048-SVW-JC, 2021 WL 1147140 (C.D. Cal. Mar. 24, 2021) (collecting

20    cases). Bratcher has not met his "especially heavy" burden to demonstrate that the failure to

21    instruct the jury with CALCRIM No. 358 cautionary instruction deprived him of due process of

22    law. *Kibbe*, 431 U.S. at 155. The jury was instructed about evaluating conflicting evidence, single

23    witness testimony, prior statements, and witness credibility in general. Fairminded jurists could

24    agree with the state court's conclusion that the omission of the CALCRIM No. 358 cautionary

25    instruction—which, as noted, would have simply told the jury to view certain statements with

26    "caution"—did not so infect the entire trial with unfairness as to violate Bratcher's Fourteenth

27    Amendment right to due process, especially where, as here, several other instructions explained to

28    the jury how to assess witness credibility.

United States District Court
Northern District of California

1    Because the state court's decision finding Bratcher's Fourteenth Amendment due process

2    right not violated by the state law jury instruction error was not contrary to, or an unreasonable

3    application of, clearly established federal law or based on an unreasonable determination of the

4    facts in light of the evidence, Bratcher's Fourteenth Amendment due process claim is denied. *See*

5    28 U.S.C. § 2254(d).

6    **II.    Bratcher's Sixth Amendment right to effective assistance of counsel was not violated**
     **       when his counsel failed to properly argue for a cautionary jury instruction during**
7    **       Bratcher's trial.**

8         Bratcher next contends that "[i]n not insisting that the cautionary instruction of CALCRIM

9    No. 358 be given to all four complaining / propensity witnesses petitioner claims his Sixth

10   Amendment right to effective assistance of counsel was violated when his counsel failed to

11   properly argue for a cautionary jury instruction during Petitioner's trial." Dkt. No. 22-1, at 5.[3]

12        To establish ineffective assistance of counsel "a defendant must show both deficient

13   performance by counsel and prejudice." *Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting

14   *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). "Failure to satisfy either prong … obviates the

15   need to consider the other." *Rios v. Rocha*, 299 F.3d 796, 805 (9th Cir. 2002). "An error by

16   counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a

17   criminal proceeding if the error had no effect on the judgment." *Strickland v. Washington*, 466

18   U.S. 668, 691 (1984).

19        **A.    The state court's reasoning.**

20        The California Court of Appeal noted that Bratcher "argued that [counsel provided

21   ineffective assistance] to the extent this court concludes defense counsel forfeited his claim of

22   instructional error or the error was invited." *Bratcher*, 2022 WL 2128061, at *12 n.14. The court

23

24   [3] Bratcher initially formulated this claim in his habeas petition as "if petitioner's claim of error
     regarding the trial court's failure to instruct with the 'cautionary instruction' was somehow
25   forfeited or invited, petitioner necessarily received ineffective assistance of counsel in violation of
     his Sixth Amendment right to the effective assistance of counsel." Dkt. No. 1 at 28, 46. The
26   California Court of Appeal found, and this Court agrees, that the trial court's failure to instruct
     was not fully forfeited or invited. The Court exercises its discretion to address the broader claim as
27   articulated in Bratcher's traverse. *See, e.g.*, *Rivera v. Broomfield*, No. 21-CV-06520-HSG, 2023
     WL 4269763, at *7 (N.D. Cal. June 28, 2023). The Court ordered and received supplemental
28   briefing from respondent on this claim. Dkt. Nos. 23, 24.

United States District Court
Northern District of California

found that "the issue was not forfeited on appeal because defense counsel ultimately did not fully withdraw his request for the cautionary instruction, or fully acquiesce in the trial court's ruling." *Id.* at *8 n.7. The court concluded that Bratcher's ineffective assistance of counsel claim was moot because "[i]n his reply brief, defendant concedes the issue would be moot if [the court] accepted the Attorney General's concession there was no forfeiture or invited error." *Id.* at *12 n.14. "Because [the court] addressed the [cautionary instruction error] on the merits, [it] [did] not address defendant's argument regarding ineffective assistance of counsel." *Id.*[4]

**B.    Bratcher's ineffective assistance claim fails because he cannot show prejudice.**

Because it found the claim moot, the state court did not consider the possible prejudicial effect of Bratcher's counsel's failure to insist upon the cautionary instruction. The state court *did* conclude, however, that the trial court's omission of the cautionary instruction was harmless in light of, *inter alia*, the other corroborating evidence presented at trial and the otherwise thorough jury instructions regarding how to assess witness credibility. Although reached in a different context, the Court notes that this holding logically forecloses Bratcher's ineffective assistance claim. The ineffective assistance of counsel prejudice inquiry asks whether the defendant has demonstrated "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 694). This standard mirrors the standard that California courts apply to evaluate prejudice arising from a state law error. *See Richardson v. Superior Ct.*, 43 Cal.

---

[4] In order to have adequately exhausted state remedies as required under AEDPA, Bratcher's claim must have been presented to the California Supreme Court through a petition for discretionary review. *See Gatlin v. Madding*, 189 F.3d 882, 888 (9th Cir. 1999). Respondent correctly points out that Bratcher's petition to the California Supreme Court stated that "in the event this court holds that appellant's claim of error regarding the trial court's failure to instruct with the 'cautionary instruction' was somehow forfeited or invited, then appellant necessarily received ineffective assistance of counsel under the sixth amendment and his convictions should be reversed on that basis." Dkt. No. 13-16, at 38. Nonetheless, there is at least a possibility that the ineffective assistance of counsel claim was properly exhausted because its factual and legal basis was presented to the California Supreme Court. *See Weaver v. Thompson*, 197 F.3d 359, 364 (9th Cir. 1999) ("The state courts have been given a sufficient opportunity to hear an issue when the petitioner has presented the state court with the issue's factual and legal basis."); *see also Poyson v. Ryan*, 879 F.3d 875, 894–95 (9th Cir. 2018). The Court proceeds in its analysis without deciding whether the claim was exhausted because a court may deny even an unexhausted claim if it is meritless. 28 U.S.C. § 2254(b)(2); *see Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).

United States District Court
Northern District of California

4th 1040, 1050 (2008); *People v. Ocegueda*, 247 Cal. App. 4th 1393, 1407 n.4 (2016) (noting that the standard applied to determine whether a state law error was prejudicial is "substantially the same as the prejudice prong of *Strickland*"); *Alvarez v. Robertson*, No. 21-CV-04626-HSG, 2022 WL 2714967, at *10 (N.D. Cal. July 13, 2022), *aff'd sub nom. Alvarez v. Lundy*, No. 22-16227, 2024 WL 5165717 (9th Cir. Dec. 19, 2024) (if the non-federal constitutional "claim was preserved, [it] does not merit reversal [under the state law error prejudice standard,] [a]nd, if it was not, the ineffective assistance of counsel claim fails for lack of prejudice" (quoting *People v. Alvarez*, No. H045451, 2020 WL 1950872, at *10 (Cal. Ct. App. Apr. 23, 2020)) (citing *Ocegueda*, 247 Cal. App. 4th at 1407 n.4)). Accordingly, while the state court asked "whether it is reasonably probable the jury would have reached a result more favorable to defendant had the [cautionary] instruction been given" only in considering whether the trial court's state law instructional error was prejudicial, *Bratcher*, 2022 WL 2128061, at *9, its conclusion is at least persuasively informative as to whether Bratcher can show the prejudice required to establish an ineffective assistance claim based on counsel's failure to insist on the same cautionary instruction.

The Court has reviewed the record independently and finds, for the same reasons articulated by the state court, that there is no reasonable probability that the result of the proceeding would have been different but for counsel's failure to insist upon an instruction that would have merely told the jury to "[c]onsider with caution any statement made by the defendant tending to show his guilt unless the statement was written or otherwise recorded." CALCRIM No. 358. As the state court explained,

> the omission of the cautionary instruction included in CALCRIM No. 358 was harmless. First, as to most of the statements, defendant did not testify one way or another as to their content but took the stand and simply denied having committed the offenses and testified his interactions with the prosecution witnesses were consensual and devoid of threats. Given defendant's denials and the uncontradicted testimony about most of his statements, the primary issue the jury had to resolve was whether the prosecution witnesses were credible or whether they fabricated their testimony. (*People v. Wilson* (2008) 43 Cal.4th 1, 19–20, abrogated on other grounds as stated in [*People v.*] *Johnson* [(2018)] 6 Cal.5th [541,] 587.)
>
> Second, the court gave the jury CALCRIM No. 226 (Witnesses),

United States District Court
Northern District of California

which extensively covered the jury's role in evaluating a witness's testimony, including a variety of factors bearing on the truth or accuracy of that testimony. Those factors included a witness's bias, interest or other motive; prior consistent or inconsistent statements; ability to remember the matter in question; and admissions of untruthfulness. When a jury is thoroughly instructed on the numerous factors involved in assessing witness credibility, failure to give the cautionary instruction in CALCRIM No. 358 is harmless because the jury has been adequately warned to view the witnesses' testimony with caution. ([*People v.*] *Diaz* [(2015)] 60 Cal.4th [1176,] 1196; [*People v.*] *McKinnon* [(2011)] 52 Cal.4th [610,] 680; *People v. Salazar* (2016) 63 Cal.4th 214, 251; [*People v.*] *Dickey* [(2005)] 35 Cal.4th [884,] 906.) The error is particularly harmless where the witnesses attributing the statements to defendant are themselves extensively impeached. (*Salazar*, at p. 251; *Dickey*, at pp. 906–907.) Here, Jane Doe, M. Doe, B. Doe, and Whitney Doe were all extensively cross-examined and impeached.

In view of defendant's denials, the absence of testimony by defendant about many of the statements, and the detailed guidance of CALCRIM No. 226, it is not reasonably probable a result more favorable to defendant would have occurred had the jury been instructed with CALCRIM No. 358.

Defendant raises additional claims. He complains that because this was a close case, the trial court's failure to give the cautionary instruction requires reversal as there is a reasonable probability the outcome of the trial would have been more favorable to him had the instruction been given. He argues there were obvious problems with the prosecution's conflicting evidence and that his version of the incident made more sense. True, the prosecution's evidence was not without discrepancies. However, the jury was aware of these discrepancies and was instructed on how to evaluate such testimony, and presumably credited the testimony of the prosecution witnesses after assessing and weighing the prosecution and defense evidence.

In the same vein, defendant contends the jury's actions during deliberation further demonstrate this was a close case because the jury asked for readback of testimony pertaining to whether drugs were in Jane Doe's system and requested to view the video of Jane Doe speaking with the "detective." Defendant also contends that in the prior trial, in which CALCRIM No. 358 was given, the jury was deadlocked for two days until the trial court erroneously excused a juror.

While readback of testimony and a jury deadlock in a prior trial are factors to consider in assessing whether a case is a close call for the jury (*People v. Diaz* (2014) 227 Cal.App.4th 362, 384–385), here, the jury arrived at its verdicts in slightly over five hours (10:35 a.m. to

3:45 p.m.). Considering the jury sat through a one-week trial that included 27 witnesses and extensive medical, GPS, and photographic evidence, the jury's five-hour deliberation (which presumably included a lunch break) was relatively short in duration. We further observe that in the prior trial, after the court excused one juror and substituted in an alternate, the jury reached verdicts, suggesting that prior to the removal of the juror, the jury was most likely hung 11 to one in favor of conviction. In our view, an 11-to-one jury deadlock in favor of conviction is not a close case. (*People v. Christensen* (2014) 229 Cal.App.4th 781, 799 [a 10-to-two jury deadlock in favor of conviction is not a close case].)

Defendant also argues that instructing the jury with CALCRIM No. 1190 and the prosecutor's emphasis on defendant's statements to Jane Doe, M. Doe, B. Doe, and Whitney Doe during closing argument compounded the prejudice created by the court's failure to give the cautionary instruction.

CALCRIM No. 1190 (Other Evidence Not Required to Support Testimony in Sex Offense Case) provides, "Conviction of a sexual assault crime may be based on the testimony of the complaining witness alone." Although the jury was instructed defendant's rape conviction could be proven by Jane Doe's testimony alone, defendant complains the jury was not instructed that her testimony and the testimony of the other witnesses about defendant's incriminating statements must be viewed with caution. According to defendant, "This was a vulnerability in the instructions that the prosecutor seized upon" in closing argument.

Defendant's argument is unavailing because in addition to CALCRIM No. 1190, the court also gave the jury CALCRIM No. 301 (Single Witness's Testimony), instructing, "The testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." The jury was further instructed with CALCRIM No. 302 that, "If you determine there is a conflict in the evidence, you must decide what evidence, if any, to believe." The jury was told not to "accept the testimony of the greater number of witnesses," and "What is important is whether the testimony or any other evidence convinces you, not just the number of witnesses who testify about a certain point." Moreover, the jury was instructed with CALCRIM No. 226, which provides, "You may believe all, part, or none of any witness's testimony." Finally, the jury was instructed with CALCRIM No. 318 on prior statements, which instructs the jury it may use prior statements "To evaluate whether the witness's testimony in court is believable." Because the court gave these four instructions, we find the jury was thoroughly instructed on how to evaluate the testimony of one witness, whether Jane Doe or defendant. The jury was also instructed the prosecutor's argument was not

evidence. As a result, defendant's contention that giving CALCRIM No. 1190 and the prosecutor's closing argument increased the prejudice of erroneously refusing to give a cautionary instruction regarding defendant's oral statements is without merit.

Next, defendant maintains that in "reality" Jane Doe's testimony was "essentially" the only evidence demonstrating she did not consent to having sexual intercourse with him or willingly stayed in the van with him, and "[i]t would be hard to imagine a conviction in this case if, due to the cautionary instruction, any one juror had a reasonable doubt." On the contrary, other evidence corroborated Jane Doe's testimony. Significantly, the jury heard evidence defendant sexually assaulted M. Doe and B. Doe, and exposed himself to Whitney Doe. The jury also heard testimony that the sexual assault examination of Jane Doe revealed redness, swelling, and tenderness on her labia minora, abrasions, and a fresh, nearly two-millimeter tear at the lower opening of her vagina. The examiner testified Jane Doe's injuries were "significant" and specifically said, "More often than not, I do not see injuries this severe in sexual assault cases." Jane Doe also made fresh complaints to A.M. and T.M., indicating she had been raped. In other words, the jury heard abundant other evidence substantiating Jane Doe's testimony.

*Bratcher*, 2022 WL 2128061, at *10–12 (footnotes omitted).

For the reasons identified by the California Court of Appeal, this Court likewise finds that Bratcher cannot demonstrate that he was prejudiced by his counsel's failure to insist upon the cautionary instruction.[5] Accordingly, Bratcher's ineffective assistance of counsel claim is also denied.

### III.    A certificate of appealability is granted only as to the ineffective assistance claim.

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a).

"The standard for granting a certificate of appealability is low." *Frost v. Gilbert*, 835 F.3d 883, 888 (9th Cir. 2016). "All that's required is that 'reasonable jurists could debate' whether the petition states a 'valid claim of the denial of a constitutional right' and whether the district court 'was correct in its procedural ruling.'" *Id.* (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

---

[5] Bratcher raises no additional arguments in his habeas petition as to why he was prejudiced by his counsel's failure to insist upon the cautionary instruction beyond those addressed in the state court's opinion.

United States District Court
Northern District of California

A petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

Bratcher has made such a showing only with respect to his ineffective assistance of counsel claim. Accordingly, the Court will issue a certificate of appealability as to only that claim.

CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that Bratcher's petition for a writ of habeas corpus must be **DENIED**. A Certificate of Appealability is **GRANTED** only as to Bratcher's ineffective assistance of counsel claim.

**IT IS SO ORDERED.**

Dated: March 31, 2025

_____
P. Casey Pitts
United States District Judge

United States District Court
Northern District of California

22